

**In the**
**Missouri Court of Appeals**
**Western District**

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | ) |
| Respondent, | ) |
| | ) |
| v. | ) WD85624 |
| | ) OPINION FILED: |
| | ) OCTOBER 10, 2023 |
| TIFFANY J MILLS, | ) |
| | ) |
| Appellant. | ) |

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Kenneth R. Garrett III, Judge**

**Before Division Two: Alok Ahuja, Presiding Judge, Anthony Rex Gabbert, Judge,**
**Thomas N. Chapman, Judge**

Tiffany Mills appeals her conviction for the class E felony of assault in the third

degree, section 565.054,[1] and the unclassified felony of armed criminal action, section

571.015.  She argues in three points on appeal that the trial court erred in failing to hold a

jury-tried punishment stage, that the trial court erred in excluding evidence, and that the

trial court erred in failing to appoint counsel for her at her initial appearance and bail

hearing.

We find Mills' three points to be without merit and deny them.  Our analysis in

Point III is premised on the reasoning of four recent cases: *State v. Heidbrink*, 670 S.W.3d

114 (Mo. App. E.D. 2023); *State v. Woolery*, No. WD 85530, --- S.W.3d ---, 2023 WL

---

[1] All statutory references are to RSMo 2016 as supplemented through the date of the offense in April 2020 unless otherwise indicated.

4188250 (Mo. App. W.D. June 27, 2023); *State v. Phillips*, No. SD 37382, --- S.W.3d ---,

2023 WL 5815843 (Mo. App. S.D. Sept. 8, 2023); and *State v. Logan*, No. WD 85831, ---

S.W.3d ---, 2023 WL 5918635 (Mo. App. W.D. Sept. 12, 2023).  Based on those cases,

we conclude that the absence of counsel at Mills' initial bail hearing was harmless error.

Given our denial of the three points on appeal, we would normally affirm the judgment.

Instead, we order that the case be transferred to the Missouri Supreme Court for final

disposition pursuant to Rule 83.02, given the general interest and importance of the issues

raised in Mills' third point on appeal.

## Facts

In September 2020, the State of Missouri ("the State") charged Tiffany Mills by

felony information with the class A felony of assault in the first degree, section 565.050

and armed criminal action, section 571.015.  The allegations pertained to events that

occurred in April 2020.  A jury trial was held in April 2022.  The following evidence was

presented at trial.[2]

The victim ("Victim") became friends with a man ("Boyfriend") who was in a

relationship with Mills.  Victim and Boyfriend worked together.  On an evening in April

2020, Boyfriend texted Victim and asked for a ride to pick up food.  Victim drove to

---

[2] "We state the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, and we reject all contrary evidence and inferences."  *State v. Foster*, 591 S.W.3d 518, 520 n.1 (Mo. App. W.D. 2019) (internal quotation marks omitted).

Boyfriend's house with her son in the backseat and parked in front of his house. Another car was parked in front of Boyfriend's house.

Victim testified Mills got out of the other car, approached Victim, and asked who Victim was and what she was doing there. Mills accused Victim of sleeping with Boyfriend. Boyfriend came out of the house and then went back in with Mills. Mills came out of Boyfriend's house and came toward the passenger side of Victim's car with something silver in her hand. Victim told Mills not to key her car.

Victim testified that Mills came toward the driver's side of the car. Victim stepped out of her car. Mills pushed Victim, and then Victim tried to hit Mills. Victim hit Mills once and tried to grab Mills' hair. Mills grabbed Victim's wrist. Victim realized Mills was stabbing her. Mills stabbed Victim seven times. Boyfriend came out of the house, and Mills engaged with him. Victim went back to her car.

Boyfriend testified that he texted both Mills and Victim that night for a ride to get food because one of them did not respond right away. They both came to his house and parked out front. They both called him to tell him they were outside. Mills asked Boyfriend who Victim was, and Boyfriend told Mills to go back to her car because he would be right out.

Boyfriend testified he heard scuffling and immediately ran outside while still on the phone with Mills. Boyfriend saw Mills on her knees in front of Victim. Victim was hitting Mills, and Mills was fighting back. Victim was holding Mills with one hand and hitting her with the other. Boyfriend broke the two women up and tried to calm Mills

3

down while Victim went back to her car.  Mills tried to hit Boyfriend a couple of times but did not make contact.

Mills testified that Victim attacked her first.  Mills did not know Victim but saw her arrive at Boyfriend's house just after Mills arrived.  Mills was on the phone with Boyfriend and mentioned the other car to him as she walked toward his house.  Boyfriend told Mills to go back to her car and that he would be out soon.  Mills walked in front of Victim's car on her way back to her own car and realized Victim was female.  Mills went back to Boyfriend's house and asked him why another woman was there for him.  Boyfriend again told Mills to go back to her car and that he would be there soon.

Mills testified that she went back outside and stopped in front of Victim's car.  Mills told Victim, "you can leave bitch, he's not going anywhere with you."  Mills testified that Victim put her car in drive and came toward her so Mills jumped into the grass.  Victim got out of the car and came around to the passenger side of the car and "started coming at" Mills so Mills called the police.  Victim grabbed Mills by the hair and hit her approximately ten to fifteen times in the face.  Mills was knocked to her knees and could not see because of a bleeding cut on her eye.

Mills testified that she had a pink knife clipped to her purse,  She cut through two tendons on her fingers trying to open it, and stabbed at Victim while holding the knife with the other three fingers.  Mills did not know if she was making contact with Victim with the knife because Victim continued to punch her in the face.  Boyfriend came out of

4

the house and pulled Victim off of Mills. Victim went back to her car. Boyfriend was yelling at Mills when police arrived.

Officers responded to Boyfriend's residence for a report of a male and female fighting in the street or for a "domestic disturbance/robbery." They arrived and saw Boyfriend and Mills arguing and yelling in close proximity to each other. Mills was trying to hit Boyfriend. The officers separated them and took their statements. Mills told police that she went to Boyfriend's house but another female showed up and started a fight with her. The officers did not observe any injury to Mills except for a cut on her hand which Mills said was self-inflicted. Mills said she pulled a knife out because she felt threatened but that she cut herself with it. Neither Mills nor Boyfriend indicated that anyone needed medical attention. Mills left the scene.

Victim stayed in her car while the police were present. She texted Boyfriend that she had been stabbed but did not want to tell the police. After the police left, Boyfriend drove Victim to the hospital. Victim needed emergency surgery for stab wounds to her stomach, arms, and back. Victim's surgeon testified regarding the extent of Victim's injuries which included a lacerated spleen, partially collapsed lung, and blood loss.

The issue of self-defense was submitted to the jury. The jury found Mills guilty of the lesser-included offense of assault in the third degree and armed criminal action. The trial court sentenced Mills to three years in the Department of Corrections for assault and three years in the Department of Corrections for armed criminal action. The sentences were concurrent.

This appeal follows.

## Standard of Review

Mills seeks plain error review of Points I and III. Under Rule 30.20, "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "Our review, therefore, is two-fold." *State v. Price*, 433 S.W.3d 472, 474 (Mo. App. W.D. 2014). "First, [we] must determine whether the trial court committed an evident, obvious, and clear error affecting the defendant's substantial rights." *Id*. (internal quotation marks omitted). "Second, even if a clear error is found, this Court cannot grant relief unless it determines that manifest injustice or a miscarriage of justice resulted from the error." *Id*. (internal quotation marks omitted).

Point II pertains to the admission of evidence. "The circuit court has broad discretion in admitting evidence at trial, and error will be found only for a clear abuse of this discretion." *State v. Brandolese*, 601 S.W.3d 519, 533 (Mo. banc 2020).

> This Court will find a circuit court abused its discretion only when a ruling is clearly against the logic and circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.

*Id*. (internal quotation marks omitted). "This Court reviews the trial court for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Id*. at 533-34 (internal quotation marks omitted). "Trial court

6

error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *Id*. at 534 (internal quotation marks omitted).

**Point I**

In her first point on appeal, Mills claims the trial court plainly erred in failing to hold a jury-tried punishment stage. She states that she never requested in writing, prior to voir dire, that the court assess the punishment in case of a finding of guilt in violation of section 557.036. Mills notes that the parties tendered jury instructions on the issue of jury sentencing at trial and that she was not examined regarding her wish to waive jury sentencing prior to the submission of the case to the jury. She argues that the failure to hold a jury-tried punishment stage resulted in manifest injustice and a miscarriage of justice.

"[T]here is no constitutional right to jury sentencing." *State v. Weaver*, 178 S.W.3d 545, 547 (Mo. App. W.D. 2005). "The defendant does however have a statutory right to jury sentencing unless he waives that right." *Id*. Section 557.036.4(1) states that "[a] second stage of the trial shall not proceed and the court, and not the jury, shall assess punishment if … [t]he defendant requests in writing, prior to voir dire, that the court assess the punishment in case of a finding of guilt." "A defendant waives his right to a jury at the punishment stage of trial when he allows the judge to determine his sentence without invoking his statutory right." *Weaver*, 178 S.W.3d at 547.

After the case was submitted to the jury and the jury verdicts were returned, the following occurred:

7

THE COURT: Ma'am, you have just been found guilty by a jury of your peers of the charges of assault in the third degree and armed criminal action. You have a right to be sentenced by the jury that has just found you guilty to these offenses. And it's my intention from reading instructions that it was your intention to have the jury sentence you at this time. Do you still wish the jury to sentence you for these charges?

THE DEFENDANT: No.

THE COURT: And you wish to waive that?

THE DEFENDANT: Yes.

THE COURT: And you discussed this fully with your attorney?

THE DEFENDANT: Yes.

THE COURT: And this is a knowing, voluntary waiver of your right to be sentenced by this jury?

THE DEFENDANT: Yes, sir.

THE COURT: And you understand you can't change your mind thereafter as soon as I accept this waiver?

THE DEFENDANT: Yes, sir.

THE COURT: And you fully discussed this decision with your lawyer?

THE DEFENDANT: Uh-huh.

THE COURT: Is that a yes?

THE DEFENDANT: Yes, sir.

THE COURT: And you understand during this proceeding of your sentencing that you would have the opportunity to present any evidence that you wish in front of the jury and the jury would hear that evidence and then deliberate and arrive at a punishment based upon all of the evidence in this case?

8

THE DEFENDANT: Uh-huh.

THE COURT: Again, you wish to waive that?

THE DEFENDANT: Yeah.

THE COURT: Any questions?

THE PROSECUTOR: No.

THE COURT: Any questions from the Defense?

DEFENSE COUNSEL: No, Your Honor.

THE COURT: Continue on.

DEFENSE COUNSEL: Judge, our request would be that given the fact that Ms. Mills has no prior convictions for her crime, criminal convictions, and the fact that she has not had any bond violations in two years, our request would be that we set sentencing out for just a couple of weeks and put her on house arrest in the meantime if necessary and then we come back so she is able to take care of her affairs and taking care of her apartment and her job, to kind of get that all wrapped together. That would be our request.

THE PROSECUTOR: The State is opposed to that request, Your Honor. These offenses -- the agreement we have is it carries the three-year mandatory on the ACA, which makes her significantly a greater flight risk than she was previously. And we also believe that the victim deserves to have this finally resolved and not see her out and about.

THE COURT: I'm going to grant the Defense's request and I'm going to tell you why and tell her why as well. There has been no sentence agreement at this point. I'm still doing the sentencing. Even though you came to an agreement of three and three and that is what I intend to honor provided she comes back. If she fails to come back, your client needs to know the range of punishment of armed criminal action which is no maximum, so if you skip out on court, I wouldn't hesitate and she will never see the light of day. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: If you do not come back for any reason, that three and three they have, I'm going to accept that if you come back on the sentencing day, but if you do not come back, there is no three and three. And I think your attorneys will let you know the range of punishment on armed criminal action and that these can run consecutive.

The following occurred at the sentencing hearing:

THE COURT: Thank you very much, Ms. Mills. Does the State want to make any argument? You will have a chance to rebut what [Defense Counsel] says. Any argument before sentencing?

THE PROSECUTOR: The sentence itself was agreed to so there is no reason for the Court to disregard that anticipating his request, but the Court heard the testimony of the doctor that treated [Victim] and how close she was to dying in this instance. You heard the testimony of [Victim] and the impact it has had on her life from her mother and from her young child. I ask that the Court stand firm with the sentence.

THE COURT: For the record, the sentence was agreed to by both parties.

THE PROSECUTOR: Three years on both counts, correct.
…
THE COURT: After full consideration, the Court will sentence the Defendant on Count -- pursuant to the plea agreement, the court will as far as Phase II only, the plea agreement as far as sentencing, the Court will follow said plea agreement.

In *Weaver*, 178 S.W.3d at 548, the defendant requested for the judge to determine his punishment orally after the prosecutor's opening statement. "As a result, the trial judge should have denied [the defendant's] request since it was untimely and not in writing." *Id*. (citing section 557.036.4(1)). This court found that the defendant "validly waived his right to jury sentencing when he requested the judge through his attorney to determine his punishment." *Id*. "Here, not only did [the defendant] choose not to invoke

10

his right to jury sentencing, but he also affirmatively expressed to the court, on three separate occasions, his request for the judge to sentence him." *Id*. "There is absolutely no evidence that [the defendant] did not intelligently waive his right." *Id*. "Although the better practice, under these circumstances, would have been to conduct a hearing on the record with the defendant affirmatively waiving his statutory right, and such hearing being held prior to submission of the case, the failure to do so does not entitle [the defendant] to a reversal and remand." *Id*. "[The defendant] fails to show under the plain error standard of review that manifest injustice has occurred." *Id*. "[The defendant] urges this court to reverse the trial court's determination of his sentence because the trial judge erroneously granted *his request* to be sentenced by the court." *Id*. (emphasis in original). "Under the plain error standard, this court cannot find that manifest injustice has taken place when [the defendant] requested court sentencing and is merely unhappy with the result." *Id*.

On appeal, Mills argues that her case is distinguishable from *Weaver* because Mills initially wanted the jury to sentence her. Jurors were questioned during voir dire regarding their ability to sentence within the range of punishment. She argues that she did not sit on her right to jury sentencing. Mills also claims that the timing of her waiver is significant. She notes that the waiver in the *Weaver* case came prior to submission of the case to the jury and that her waiver came after the verdicts were returned.

Mills urges this court to look at section 558.021.2 which requires a defendant to be proved as a prior offender prior to submission of the case to the jury. She cites *State v.*

*Robinson*, 353 S.W.3d 448, 450 (Mo. App. E.D. 2011), where the court found the defendant to be a prior offender. In that case, the State did not allege that the defendant was a prior offender and there was nothing in the record to warrant such a finding. The appellate court found the designation of prior offender to be error. *Id.* The appellate court found that "[t]he only legal consequence of finding prior offender status is the loss of the right to jury sentencing." *Id.* (internal quotation marks omitted). The appellate court further noted that the designation might impact future parole eligibility and corrected the judgment and sentence to remove the prior offender classification. *Id.* Mills notes that prior offender status must be proved prior to submission of the case even though the only consequence is loss of jury sentencing; accordingly, she claims jury sentencing must also be waived prior to submission of the case to the jury. We find this line of reasoning inapplicable because it does not involve a waiver by the defendant.

In this case, the trial court permitted Mills to waive jury sentencing at her request. The court made a clear record that the waiver was knowing and voluntary and that Mills had discussed the decision with her attorney. Further, the State and Mills came to a sentencing agreement of three years for assault in the third degree and three years for armed criminal action. The court honored that agreement. The three year sentence for armed criminal action is the minimum sentence allowed under section 571.015.1. Mills has not shown that manifest injustice has occurred as required by the plain error standard of review. The trial court in this case is being faulted by Mills for granting Mill's request. "Under the plain error standard, this court cannot find that manifest injustice has taken

place when [the defendant] requested court sentencing and is merely unhappy with the result." *Weaver*, 178 S.W.3d at 548. The point is denied.

## Point II

In her second point on appeal, Mills claims the trial court erred to her prejudice in excluding evidence of specific instances of the victim's violent behavior after the State presented evidence of the victim's reputation for non-violence. She argues that once the prosecution offers testimony in the form of the victim's reputation for non-violence, the defense may offer rebuttal testimony in a case where self-defense is claimed in the form of specific instances of the victim's violent behavior. Mills states that the evidence would have shown that the victim was the first aggressor.

In this case, Mills claimed self-defense. Prior to trial, the State filed a motion to exclude the testimony of Victim's sister-in-law ("Sister-In-Law"). Sister-In-Law's brother is married to Victim. The State alleged that Sister-In-Law would improperly testify about specific acts of prior violence. The State also argued that Sister-In-Law was not competent to testify regarding Victim's reputation generally because she had not been associated with Victim for many years. Mills' defense counsel responded that Sister-In-Law would not be asked "about any specific acts on direct examination" and instead would only be asked about "her view of [Victim's] general reputation." The court denied the motion to exclude Sister-In-Law but stated it would allow the State to voir dire Sister-In-Law before testifying at trial and that it would allow the State to renew its motion after.

13

During opening statements, the defense told the jury that Victim "has a reputation for being aggressive." Defense counsel also told the jury that the evidence would show that Victim attacked Mills first, and Mills was defending herself.

In the State's direct examination of Boyfriend, the following occurred:

THE STATE: [Victim] is a little, tiny girl, isn't she?

BOYFRIEND: I mean she's – she's – she's small.

THE STATE: And you have never known her to be aggressive?

DEFENSE COUNSEL: May we approach?
(The following proceedings were had out of the hearing of the jury:)

DEFENSE COUNSEL: These questions are all leading questions.

THE STATE: I will rephrase it, Judge.
(The proceedings returned to open court:)

THE STATE: [Boyfriend], did you ever know [Victim] to be an aggressive person?

BOYFRIEND: Not really, no.

Later, Mills' defense counsel called Sister-In-Law to testify regarding specific bad acts committed by Victim that Sister-In-Law either witnessed herself or heard from her brother who is Victim's husband. The State argued that specific acts were not admissible and that only reputation evidence could be admitted to show who the initial aggressor was. Defense counsel argued that the State had opened the door when it asked Boyfriend about Victim's size and if he knew Victim to be violent.

14

The trial court proceeded with Sister-In-Law's voir dire. Sister-In-law testified that Victim lived with her when Sister-In-Law was fourteen years old and Victim was seventeen years old. Sister-In-Law had no contact with Victim after that time period. Sister-In-Law testified that Victim had a violent reputation.

Sister-In-Law testified about an incident seven or eight years prior in which Sister-In-Law started a fight with Victim and beat her up. She recalled another incident where Victim "was in [Sister-In-Law's] grandma's face and yelling at her." Sister-In-Law testified about a time four years earlier in a Walmart when Victim thought a person at a nearby register was looking at her. Victim said to the person, "what the fuck are you looking at you stupid little bitch, keep your eyes to yourself."

Sister-In-Law also testified about three other incidents where Victim acted violently or aggressively that Sister-In-Law heard about from other people. She stated that Victim assaulted her husband, Sister-In-Law's brother, multiple times and that the police were called. One incident occurred outside of Victim's work, and one incident occurred in a hotel. A third incident involved Victim and Victim's friends assaulting her husband.

The trial court allowed Sister-In-Law to testify about the Walmart incident and the fight between Sister-In-Law and Victim.[3] The court excluded the rest of the incidents,

---

[3] In her brief, Mills states the trial court only allowed in one of the six incidents Sister-In-Law testified about: the event in Walmart. The trial court ruled:

Here is where I'm at. I'm going to let the Wal-Mart situation in. I think I -- I get you, I'll let that in. *And the fight that the victim -- but, you know, that's a cross-examination question who started the fight. It is what it is.* I think the rest of

15

finding that the probative value was substantially outweighed by the prejudicial effect of that testimony. At trial, Sister-In-Law testified that she has known Victim for ten years and that she has knowledge of Victim's reputation from family. Sister-In-Law testified:

Q. Do you know [Victim] to be an aggressive person?

A. Aggressive and confrontational.

Q. Is there any other traits you would use to describe her?

A. Bipolar.

Q. Excuse me?

A. Bipolar.

Q. And have you ever seen her get aggressive with a stranger?

A. Yes.

Q. Can you describe that incident?

A. We were at Wal-Mart and she got in this guy's face for looking at her, which is still aggressive. It's not just confrontational. You can't have aggression without having confrontation.

Q. And did you have any part in arguing with the man?

A. No.

Q. Why did she get in his face?

A. He was looking at me and she thought he was looking at her.

---

them, I think the probative is substantially outweighed by prejudicial effect after weighing and balancing and listening to the testimony, so I will exclude those. Mills quotes the above passage in her brief but leaves out the italicized words and instead used an ellipsis. The State asserts that the trial court allowed both the Walmart incident and the fight Sister-In-Law started with Victim to be admitted into evidence. We agree.

16

Q. And what happened next?

A. I told her to walk away.

Q. Did she willingly walk away when you told her that?

A. No, I had to drag her away.

The State cross-examined Sister-In-Law about her sporadic contact with Victim in the prior years. The State also asked whether the Walmart incident turned violent, and Sister-In-Law stated that it did not because she drug Victim away.

"Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." *Balbirnie v. State*, 649 S.W.3d 345, 356 (Mo. App. W.D. 2022) (internal quotation marks omitted). "Logically relevant evidence is admissible only if legally relevant." *Id*. at 357 (internal quotation marks omitted). "Legal relevance weighs the probative value of the evidence against its costs—unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Id*. (internal quotation marks omitted).

"A victim's reputation for violence, turbulence, and aggression may be admissible when a defendant has asserted self-defense." *State v. Gonzales*, 153 S.W.3d 311, 312 (Mo. banc 2005). "Evidence of the victim's reputation for violence is logically relevant to two distinct issues in the self-defense context—the reasonableness of the defendant's fear of the victim and to prove that the victim was the initial aggressor." *Id*. Reputation evidence offered for the purpose of showing the reasonableness of the defendant's fear of the victim is only admissible if there is evidence that the defendant was aware of the

17

victim's reputation. *Id*. at 313. "[A] defendant is not required to demonstrate his awareness of the victim's reputation to the extent the victim's reputation for violence is offered on the question of who was the initial aggressor." *Id*.

In the current case, Mills did not know Victim prior to the assault. Thus, reputation evidence about Victim could only be offered on the question of who was the initial aggressor. Mills was able to call Sister-In-Law as a witness and have her testify that Victim was known to be aggressive and confrontational. Moreover, Sister-In-Law testified about an incident where Victim was aggressive and confrontational toward a stranger in Walmart.

The trial court ruled that Sister-In-Law could not testify about an incident Sister-In-Law directly witnessed where Victim yelled at Sister-In-Law's grandma and three incidents that Sister-In-Law did not directly witness where Victim assaulted her husband who was Sister-In-Law's brother. These are specific acts of violence and not general reputation testimony.

"[T]he trial court may permit a defendant to introduce evidence of the victim's prior *specific acts* of violence of which *the defendant had knowledge*, provided that the acts sought to be established are reasonably related to the crime with which the defendant is charged." *Brandolese*, 601 S.W.3d at 534 (internal quotation marks omitted) (emphasis in original). Mills admits in her brief that "there is nothing in the record to suggest that the defendant herself was personally aware or had knowledge of these specific instances of the victim's violent behavior." Mills argues on appeal, though, that the above

18

precedent is limited to situations in which the character of the victim is offered by the defense in its case-in-chief.

Mills states that her case is distinguishable because the State offered testimony regarding Victim's reputation for non-violence, and she should have been permitted to rebut that evidence. Mills contends that no Missouri cases have addressed this issue. In her brief, Mills claims that Boyfriend's testimony "first injected the issue of the victim's reputation for non-violence." She argues that the defense should have been allowed to call Sister-In-Law as rebuttal witness "to present any competent testimony that tends to explain, counteract, repel or disprove evidence offered by the State on the issue of the victim's reputation for non-violence."

We need not address Mills' argument that the caselaw cited above does not apply where the State first injects the issue of the victim's nonviolence into a trial. "[A] party can open the door to the admission of evidence with a theory presented in an opening statement…." *State v. Wood*, 580 S.W.3d 566, 577 (Mo. banc 2019) (internal quotation marks omitted); *see also Bucklew v. State*, 38 S.W.3d 395, 401 (Mo. banc 2001) (concluding defense counsel opened the door to the admission of evidence the defendant previously committed an assault by mentioning background facts of the assault during opening statements). Defense counsel's opening argument included the following:

> Now, here is the part [Mills] regrets. And this is what she has to deal with. She stops in front of the car and she said, "you can leave, bitch, he's not going anywhere with you." She regrets that. She wishes she didn't say it. She was really mad at her boyfriend and she said it. But this wasn't a threat. She didn't say, you can leave or I'm gonna beat you down or attack

19

you.  And [Mills] is not holding a knife, she is holding keys and a phone and she is walking back out to her car.  There is no threat.  She doesn't know [Victim] at all and she didn't know that [Victim] was the person sitting in the car.  *She certainly had no idea that [Victim] has a reputation for being aggressive.*

The State objected and the parties presented their arguments to the trial court.  The parties were focused on the anticipated testimony of Sister-In-Law and what, if anything, she would be permitted to testify about.  The trial court stated:

At this point, I would stay away from that until I can make a legal determination on whether this is admissible or not because I don't have a basis for that as of yet, so it very well could be expected that's going to happen, but if it doesn't, *then I think the poison is already in the air*, so try and stay away from that at this point.

The court did not sustain the objection, strike the statement, or instruct the jury to disregard the statement.  Defense counsel continued:

So when [Mills] said those things, *she didn't know it was [Victim] and she didn't know anything about [Victim]* and she certainly didn't know that [Victim] had Amphetamines in her system.  After [Mills] told [Victim] to leave, [Victim] gunned her vehicle towards [Mills].  [Mills] still had her phone in her hand and she called 911.  And as she called 911, [Victim] parked her car, put her car in park and got out and started coming towards her.

We find that defense counsel was the first party to bring up the issue of Victim's reputation for violence or non-violence.

Defense counsel stated in opening argument that Victim had a reputation for being aggressive, Boyfriend testified that he did not know Victim to be an aggressive person, and then Sister-In-Law testified that Victim was aggressive and

20

confrontational and gave an example. The trial court did not abuse its discretion in excluding part of Sister-In-Law's testimony. The point is denied.

## Point III

In her third point on appeal, Mills claims the trial court plainly erred in failing to appoint counsel for her at her initial appearance and bail hearing. She states that Rule 31.02(a) requires the trial court to appoint counsel at the first appearance upon a showing of indigency unless the right is waived. Mills argues that a bail hearing is a critical stage of the prosecution and that the failure to appoint counsel or certify compliance with Rule 31.02 resulted in manifest injustice and a miscarriage of justice.

Mills' point relied on involves interpretation of Rule 31.02(a), which states in relevant part:

> (a) In all criminal cases the defendant shall have the right to appear and defend in person and by counsel. If any person charged with an offense, the conviction of which would probably result in confinement, shall be without counsel upon his first appearance before a judge, it shall be the duty of the court to advise him of his right to counsel, and of the willingness of the court to appoint counsel to represent him if he is unable to employ counsel. Upon a showing of indigency, it shall be the duty of the court to appoint counsel to represent him. … If at any stage of the proceedings it appears to the court in which the matter is then pending that because of the gravity of the offense charged and other circumstances affecting the defendant, the failure to appoint counsel may result in injustice to the defendant, the court shall then appoint counsel. Appointed counsel shall be allowed a reasonable time in which to prepare the defense.

Mills claims the following:

> This rule mandates a clear directive to any judge whenever a defendant appears in court without counsel upon his first appearance. Specifically, when the defendant appears without counsel upon his first appearance, the

> judge must do the following: (1) the judge should first determine if a conviction of the charged offense "would probably result in confinement[.]" If that is true, then the judge has the following duty: (2) the judge *shall* advise the defendant of his right to counsel, "and of the willingness of the court to *appoint* counsel to represent him if he is unable to employ counsel." (3) After that is done, and "upon a showing of indigency," the court *shall* then *appoint* counsel to represent the defendant, *unless* the defendant has "intelligently waived his right to have counsel[.]"

(Emphasis in brief.)

A warrant issued for Mills' arrest on May 9, 2020, which set her bond at "$250,000 10%." Mills' initial appearance occurred two days later on May 11, 2020. The docket entry for the appearance notes that the court referred the case to the Public Defender's Office for screening, and that bond remained set at "$250,000. 10%." The court continued the case for one week. An attorney from the Public Defender's Office entered her appearance for Mills on May 14, 2020, three days after the initial appearance, and filed a motion for bond reduction on the same day. On May 18, 2020, the court granted Defendant's motion and released her on her own recognizance under house arrest.

Mills complains that the trial court did not appoint counsel at this initial hearing. Instead, the trial court entered an order that referred Mills to the Public Defender's Office for screening. Mills claims that, had counsel been appointed at her initial appearance, she would have secured her pretrial release at the initial hearing instead of days later. Mills also notes that the trial court could not have appointed a public defender to represent her. *State ex rel. Missouri Pub. Def. Commn. v. Pratte*, 298 S.W.3d 870, 886 (Mo. banc 2009)

22

("Trial judges have the ability under Rule 31.02(a) to appoint almost any lawyer from The Missouri Bar to represent indigent defendants and ensure their constitutional right to counsel is met but not someone who also happens to be a public defender."). Mills complains that she was referred to the Public Defender's Office for screening instead of appointed an attorney under Rule 31.02(a). She states in her brief:

> Simply put, the courts themselves must begin making their own indigency determinations for purposes of having counsel *appointed* at the defendant's first appearance. It is not appropriate or proper to refer this matter to the Public Defender's office. The result will always be the unavailability of counsel at the defendant's first appearance, which violates Rule 31.02(a).
> …
> Implementing such a procedure for the appointment of private counsel for indigent defendants in criminal cases should not be difficult.
> …
> It is time for Missouri to implement such a system. No one can seriously deny that an indigent defendant who is in custody in a criminal case should have the assistance of counsel at their initial appearance hearing when the conditions of bail are determined. The failure to follow the mandates in Rule 31.02(a) relating to the right to counsel in this case has resulted in per se reversible error.

(Emphasis in brief.)

"Rule 31.02(a) does not support [a claim] that the court erred in failing to appoint counsel at [an] arraignment/initial appearance." *State v. Woolery*, No. WD 85530, --- S.W.3d ---, 2023 WL 4188250, at *3 (Mo. App. W.D. June 27, 2023). "The rule requires simply that, upon the first appearance before a judge by a person charged with a crime that could result in incarceration, the court advise the person of his right to counsel and the court's willingness to appoint counsel if the person cannot afford one." *Id.* "The rule does not address arraignment nor does it require suspension of an initial appearance until

23

counsel has been appointed." *Id*. "In fact, the rule expressly contemplates that a defendant may 'be without counsel upon his first appearance.'" *Id*. (quoting Rule 31.02(a)).

In the current case, counsel from the public defender's office entered an appearance three days after Mills' initial appearance, with no intervening court appearances by Mills. As in *Woolery*, this strongly suggests that, after being informed at her initial appearance of her right to counsel, Mills sought and obtained services from the public defender's office. This negated any further obligation the court may have had under Rule 31.02(a) to appoint counsel for her. Given this, there was no violation of Rule 31.02(a).

Mills also argues that she had a constitutional right to counsel. "Our Rule 31.02(a) mirrors the protections of the state and federal constitutions, requiring that '[i]n all criminal cases, the defendant shall have the right to appear and defend in person and by counsel.'" *State v. Heidbrink*, 670 S.W.3d 114, 133 (Mo. App. E.D. 2023). "Federal cases instruct that the right to counsel attaches at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty." *Id*. (internal quotation marks omitted). "As for the timing of the appointment of counsel, counsel must be appointed within a reasonable time after attachment to allow for adequate representation at any *critical stage* before trial, as well as at trial itself." *Id*. (internal quotation marks omitted) (emphasis in original). An initial appearance or arraignment is not a critical stage in Missouri. *Heidbrink*, 670 S.W.3d at

24

133-34 (rejecting an argument that the trial court plainly erred in failing to appoint counsel at the defendant's initial appearance); *Woolery*, --- S.W.3d at ---, 2023 WL 4188250 at *5 ("In short, under Missouri law, arraignment is not a critical stage in a criminal proceeding and thus, absent some prejudice to the accused, the absence of counsel at the arraignment does not violate due process." (internal quotation marks omitted)); *State v. Phillips*, No. SD 37382, --- S.W.3d ---, 2023 WL 5815843, at *3 (Mo. App. S.D. Sept. 8, 2023) ("If an arraignment is not deemed a critical stage per se, then an initial appearance, which is not subject to the formalities and procedures of an arraignment hearing or trial-like confrontation, also would not qualify as a critical stage for counsel appointment purposes unless a defendant could show he was prejudiced by the absence of counsel.").

Mills focuses on the delay in obtaining her pretrial release. She makes the argument that a bail hearing is a critical stage. Mills is referencing the initial appearance when the bail conditions were first set. Rule 22.08 states in relevant part:

> *Upon the defendant's initial appearance*:
> **(a)** The court shall inform the defendant of the felony charged, the right to retain counsel, the right to request the appointment of counsel if the defendant is unable to retain counsel, and the right to remain silent. …
> …
> **(c)** *If the defendant is in custody after arrest on a warrant, the court shall inform the defendant of the conditions of release, if any,* and determine whether the defendant can meet the conditions. If a defendant is unable to meet the conditions, then, subject to the right of a victim to be informed of and heard at a bail hearing, the court may modify the conditions of release, if the court determines the circumstances of the defendant and the case require modification of the conditions. The court shall inform the defendant that a warrant for arrest may be issued immediately upon any

25

violation of a condition of release. If the defendant is not released from custody following the initial appearance, the court shall advise the defendant of the right to a release hearing pursuant to Rule 33.05.

(Emphasis added.) Rule 33.05 states in relevant part:

A defendant who continues to be detained after the initial appearance under … Rule 22.08 shall have the defendant's detention or conditions of release reviewed at a hearing by the court subject to the right of a victim to be informed of and heard at the hearing. The hearing shall occur as soon as practicable but no later than seven days, excluding weekends and holidays, after the initial appearance, absent good cause shown by the parties or the court. At the hearing, the court shall determine if the defendant shall be detained or released as provided in Rule 33.01. …

In *State v. Logan*, No. WD 85831, --- S.W.3d ---, 2023 WL 5918635, at *2 (Mo. App. W.D. Sept. 12, 2023), the defendant was arraigned at his initial appearance. The court declined to set a bond for the defendant because he was a danger to the community. *Id*. Five days later, the court held a detention review hearing. *Id*. The defendant appeared without counsel and a $10,000 bond was set. *Id*. Twenty-one days after that, the defendant appeared with counsel and was released on his own recognizance. *Id*.

The defendant complained on appeal that he did not have counsel during his initial bail hearing and the detention review hearing. *Id*. at *5. "Whether a defendant is entitled to release pending trial, and if so, on what conditions, are clearly important issues." *Id*. "Depriving a defendant of their liberty, prior to an adjudication of guilt, is significant of itself." *Id*. "But detaining a defendant may also have other serious consequences, including potential loss of employment, housing, and familial relationships." *Id*. "We

26

also recognize that advocacy by trained legal counsel can be helpful to a defendant seeking to be released pending trial." *Id.*

*Logan* held that "[e]ven if bail hearings are critical stages at which an accused is constitutionally entitled to the presence of counsel, the absence of counsel at [the defendant's] initial bail hearing, and at [the defendant's] detention review, was harmless error, and does not justify reversal." *Id.* at *6. A "harmless-error analysis applies where counsel was absent at a critical stage of a criminal proceeding, but the particular event during which the defendant was unrepresented did not taint the entire prosecution." *Id.* at *7. "Even if [the defendant's] initial bail hearing, and the detention-review hearing held five days later, were 'critical stages,' the absence of counsel at those hearings constituted harmless error which cannot justify reversal of [the defendant's] convictions." *Id.* "The hearings did not result in [the defendant] irrevocably giving up any important rights or potential defenses, and nothing from the hearings was used as evidence against [the defendant]." *Id.* The court observed that, pursuant to Rule 33.05 set forth above, a defendant is free to make a subsequent application for review of the defendant's conditions of release. *Id.*

This court in *Logan* found that the defendant's "initial bail hearing, and his detention-review hearing, without counsel did not prejudice [his] ability to later seek more lenient release conditions – much less have any effect on his trial, conviction, or sentencing." *Id.* "Although [the defendant] was able to obtain his release on his own recognizance once counsel appeared on his behalf, he has pointed to nothing which

27

occurred during his detention between his arraignment on August 18, 2022, and his release on September 13, 2022, which affected later proceedings in his case." *Id.* "The absence of counsel during [the defendant's] initial bail hearings was harmless error beyond a reasonable doubt, and cannot justify reversal." *Id.*

The same is the true in this case. Mills' initial appearance was on May 11, 2020. She was released on her own recognizance on May 18, 2020. Mills argues that nothing is more critical that the denial of liberty, even if the liberty is one day in jail. She does not identify anything that occurred during her detention that affected later proceedings in her case. We would find, as in *Logan*, that the absence of counsel at Mills' initial bail hearing was harmless error. As discussed below, however, rather than finally disposing of Mills' appeal, we transfer this case to the Missouri Supreme Court for decision.

**Transfer to Missouri Supreme Court**

Our analysis in Point III is premised on the reasoning of four recent cases: *State v. Heidbrink*, 670 S.W.3d 114 (Mo. App. E.D. 2023); *State v. Woolery*, No. WD 85530, --- S.W.3d ---, 2023 WL 4188250 (Mo. App. W.D. June 27, 2023); *State v. Phillips*, No. SD 37382, --- S.W.3d ---, 2023 WL 5815843 (Mo. App. S.D. Sept. 8, 2023); and *State v. Logan*, No. WD 85831, --- S.W.3d ---, 2023 WL 5918635 (Mo. App. W.D. Sept. 12, 2023). All of these cases involve whether a defendant has a right to representation at various pre-trial stages.

The Eastern District in *Heidbrink* stated that the arraignment was the first critical stage of the defendant's case and that prejudice is presumed where counsel was absent at

a critical stage of a criminal proceeding. 670 S.W.3d at 133-34. Transfer to the Missouri Supreme Court was denied in that case.

In *Woolery*, this court found those statements to be dicta and stated that *Heidbrink* ignored important precedent. --- S.W.3d at ---, 2023 WL 4188250 at *5 n.12. *Woolery* held that an arraignment in Missouri is not a critical stage requiring the present of defense counsel. *Id*. at *5. Because of that, the defendant had to show prejudice such as that the defendant suffered a disadvantage or the State gained an advantage in the prosecution of the case. *Id*. at *5-6.

The Southern District in *Phillips* relied on *Woolery* and found that an initial appearance or arraignment are not critical stages and that the defendant had to show prejudice. --- S.W.3d --, 2023 WL 5815843 at *3.

This court's analysis in *Logan* is set out in detail above, and we find it to be persuasive.

The Supreme Court has recently granted transfer in *Woolery* and *Phillips*. This court is transferring *Logan* to the Missouri Supreme Court pursuant to Rule 83.02. Given that all of these cases involve the same issue and that the Missouri Supreme Court will soon be addressing that issue, transfer of this case under Rule 83.02 is appropriate.

## Conclusion

For the reasons explained in this opinion, we would affirm the trial court's judgment. However, given the general interest and importance of the issue in Point III, and considering that the Missouri Supreme Court will be addressing this issue in multiple

29

other cases, we do not finally decide Mills' appeal.  Instead, we transfer her appeal to the Missouri Supreme Court pursuant to Rule 83.02.

_____
Anthony Rex Gabbert, Judge


All concur.